IN THE

# SUPREME COURT

OF

# PENNSYLVANIA.

Lancaster District. May Term, 1812.

ELLIOT *against* ELLIOT.

1812.

*Monday,*
May 25.

THIS was an appeal from a decree of the Orphan's Court for the county of *Dauphin.*

The case, as it appeared from the record, and a variety of depositions that were taken in this court, was thus: *Daniel Elliot* the father of both parties, died intestate prior to the year 1794, leaving issue *John* the appellee, *West* his second son, *Mary,* who afterwards married *James Hamilton,* and *William* the youngest son, the appellant. At the time of his death, he was seised in fee of part of an island in the river *Susquehanna,* which had been surveyed by virtue of a warrant from the late proprietaries of *Pennsylvania;* nature of an adversary suit at common law, notice to the minor, or to those having the care of his interests is sufficient.

The decree of an Orphan's Court, ordering the real estate of an intestate, at the valuation, to his oldest son, is not *void,* as against a minor child, merely because the minor did not appear by *guardian.* No act of assembly requires such appearance, and, the proceedings not being in the

But if such decree is erroneous, a minor is not concluded by his own, or his guardian's acceptance of the sum at which his interest in the estate is valued, provided as soon as practicable after his arriving at lawful age, he takes the necessary steps to question the proceeding. He is not concluded, though he accepted the purpart after he came of age, if he was then ignorant of the wrong done to him.

In a petition for the partition of such an estate, it is not essential to state the fisheries that may belong to it. It is enough if the Inquest take them into view in their valuation.

In the admeasurement of islands in the *Susquehanna,* it seems, the practice of surveyors is not to include the land which lies between the bank, and the water's edge; and therefore that a valuation, made upon the basis of a survey which did not include that land, would not for that cause be erroneous.

VOL. V.                    A

1812.

ELLIOT
v.
ELLIOT.

but no patent had issued. On the 7th of *June*, 1798, *Alexander Lowry*, the maternal grandfather of the parties, obtained a patent, in trust for all the children of *Daniel Elliot*. In *December* 1799, *John Elliot*, the appellee, petitioned the Orphan's Court of *Dauphin* county, within which the land lay, to appoint an inquest to view his father's part of the island, which he alleged consisted of 220 acres 147 perches, (the quantity in the patent,) that it might be divided among all the children if it admitted of division, but if not, that it might be valued, and the whole assigned to him upon his giving security to pay his brothers and sister their proportions according to law. This petition did not state that any of the children were minors, although the appellant was then about thirteen years old, nor did it state that there were valuable fisheries appurtenant to the island, although that was the fact.

The court directed an inquest to be summoned agreeably to the prayer of the petition, and the jury, one of whom was *Hamilton* who afterwards married the daughter, viewed and valued the land, in the presence of *John* the appellee, *West* the second son, and *Alexander Lowry* the grandfather with whom *William* the appellant resided in *Lancaster* county; and being of opinion that it could not be divided without injury to the whole, they valued it at 2209*l.* 0*s.* 11*d.* which was 10*l.* the acre for the quantity mentioned in the patent. The valuation was confirmed by the Court, and by their decree it was assigned to *John*, who gave security to pay their proportions to the rest of the family.

*William* had several guardians subsequent to this decree, among whom were *West*, his brother, who acted until 1806, when *James Ross* of *Pittsburg* was appointed and continued during the minority. *West* received part of *Williams'* proportion of the island. Mr. *Ross* received the residue, and on his coming of age, paid the balance due to him, and was exonerated from the trust. *William* came of age in *December* 1806.

In *November* 1807, *William Elliot* presented a petition to the same Orphan's Court, stating the inquisition, valuation, and the confirmation of it; that he had arrived at lawful age in *December* 1806, and requesting them for various causes to vacate their former decree. The Orphan's Court how-

ever after hearing the petition, confirmed their former decree, and from this the present appeal was entered.

The objections here taken on behalf of the appellant, were

1. Matter of Law. That the proceedings were void, because *William Elliot*, had not appeared by guardian, to the petition of *John* in 1799;—and also because the petition did not contain a true statement and description of the property to be divided, as it omitted the fisheries.

2. Matter of fact. That the appellee had fraudulently concealed from the inquest the true quantity of land, representing it to be only 220 acres 147 perches the amount in the patent, whereas it was actually 240 acres and upwards; and if there was no fraud, still the jury made a mistake in supposing the quantity to be less than it really was.

The evidence taken in this Court, proved, in addition to some of the facts before stated, that *Alexander Lowry* the grandfather, had been very solicitous for the interest of all *Elliot's* children, had obtained the land for them by paying the arrears of purchase money, and had attended the jury. That the jury had taken into consideration the fisheries, and valued the land in connection with them, at a price which all but two of the inquest thought too high, until one of the two offered to give the price for it. That the land was surveyed by *Bartram Galbraith* prior to its being patented, when he excluded the strip between the bank and the water's edge, and made the remaining quantity 220 acres 147 perches, and allowance. That *Thomas Smith* surveyed it in 1807, and made the quantity 240 acres and allowance, measuring, as he stated in his deposition, from the top of the bank on one side to the top on the other. But one of his chain-carriers swore that he made them sometimes go below the bank, and that in 1808 the water was three feet deep in part of the line run by *Smith*. He surveyed it when the river was low. That it was surveyed in 1762, when partition was made of the island, and the quantity then estimated was 223 acres and allowance. That *John Elliot* told the jury they were to be guided by the quantity in the patent, but afterwards in 1806 offered to sell it for 50*l.* the acre, saying he had been offered 100 dollars per acre, and that there were between 240 and 250 acres *nett*.

No other member of the family but *William*, questioned the valuation.

*Elder* and *Hopkins* for the appellant. 1. The petition of *John Elliot* should have stated, or in some other way it should have been made known to the Court, that *William Elliot* was a minor. By the act of 1713, that court has power to appoint guardians generally, and could have provided for the case. It is incident moreover to every court to appoint a guardian *ad litem*. *Mockey* v. *Grey* (*a*). The proceeding, though by petition, is in its nature an adversary one, and involves the interests of third persons, as much as a suit at common law. Hence there is the same necessity for a guardian, and the same consequences must flow from an appearance in any other way than by guardian, as in a suit at common law; namely, the proceeding is void. It cannot be questioned that notice to the minor was essential. It has been decided in *Walton* v. *Willis* (*b*), that in this very kind of proceeding notice in fact must be given to all who are interested, that they may appear, and in any way object to, or superintend, the partition. But what is notice to an infant? Or what is an appearance by an infant? In law it is nothing. No other appearance but by guardian can be recognized; and therefore the presence of the grandfather of all the parties, was in law nothing. In point of effect also it was nothing; for the presence of a common friend, not particularly called to protect the interests of the minor, will not produce that equality in the condition of the opposing parties, which it is the object of the law to produce. The law is perfectly settled. An infant can defend only by guardian; and it is the business of the plaintiff to move the court to assign one, if a guardian is not already appointed. It is error to appear in any other way. 3 *Bac. Ab.* 616. *Infancy*, K. 2.

The petition was defective in another particular. Although it described the land by courses and distances, it omitted to notice the fisheries. It was an imposition upon the court and jury, to lead them by this special description of the property, from the consideration of an object which formed its prin-

(*a*) 2 *Johns.* 192.          (*b*) 1 *Dall.* 353.

cipal value. The petition should be as precise as a declaration in partition.

2. *John Elliot* practised a fraud upon the court and jury in misrepresenting the quantity of land. He knew the real quantity. He was present at *Galbraith's* survey, when all beneath the bank was excluded, and did not mention its actual contents until it had become his own. The land to the water's edge should have been included. The survey of *Smith* made 240 acres, although he did not include the shore, but merely went on the shore occasionally, the better to measure the fast land. *Galbraith's* survey was inaccurate, and the appellee knew it. His misrepresentation defeats the partition.

But at all events the inquest made a plain mistake in the quantity, which exceeded their estimate more than 19 acres. This is fatal to their valuation, and may be relieved against. *Bingham* v. *Bingham* (a), *Gee* v. *Spencer* (b), *Cocking* v. *Pratt* (c).

*Fisher* and *Montgomery* for the appellee, made a preliminary objection to the appeal, because after payment and acceptance of the purparts, such a decree could not be opened, and because the appeal was not taken from the original decree, but from the decree confirming the original decree. They contended further, that the acts of the several guardians of *William Elliot*, in accepting his purpart of the valuation, and of himself in receiving the balance due to him after arriving at lawful age, were a ratification of the proceedings, and barred him from setting up any objection to them. For which they cited 3 *Bac.* 611. *Infant. I.* 8., *Co. Litt.* 171. *a.*

Upon the merits they argued in answer to the objections of the appellant. 1. That the proceeding before the Orphan's Court was not at all in the nature of an adversary suit at common law. That it neither called for nor permitted an appearance, strictly speaking. That at the date of this partition, no act of assembly required notice out of the county where the petition was exhibited, and therefore had it been omitted altogether, in consequence of the appellant's residence in *Lancaster* county, that circumstance would not have

1812.
___

ELLIOT
v.
ELLIOT.

(a) 1 *Ves.* 127.     (b) 1 *Vern.* 32.     (c) 1 *Ves.* 400.

1812.

ELLIOT
*v.*
ELLIOT.

affected the case. All however that could be required was an opportunity to be heard, however irregularly it might be given, or however informal the hearing; and it could not be questioned, that a hearing by the grandfather of the appellant, was equivalent to any that a guardian could have had. In fact he was the natural guardian of the appellant. Both his parents being dead, the grandfather was the guardian in socage; *Carell* v. *Cuddington* (*a*); and his powers were perfectly adequate to an appearance of a technical kind, and to many more important acts. *Co. Litt.* 88. *b. note* 66, 67., 14 *Vin.* 184. 2. *pl.* 1. *Byrne* v. *Van Hoesen* (*b*). The partition has been made fairly and without prejudice, as is proved by the silence of other members of the family; and this would be sufficient to bind an infant, because it comes within that rule that infants are bound by acts that they ought to do, although not done in form of law. *Zouch* v. *Parsons* (*c*).

The fisheries were taken into consideration by the jury, and they were estimated in the price per acre. It was not essential to mention them in the petition, because they were plainly implied. Every one knew that such an island in the *Susquehanna* had the benefit of fisheries.

2. Fraud in the mistatement of the quantity is not proved. The difference between the nominal and actual quantity, is in the strip between the bank and the water, which in the admeasurement of islands is uniformly excluded. Occasionally it is covered with water, and at all times is unfit for tillage. *Galbraith's* survey is but two acres less than that of 1762, which may be accounted for by the occasional wearing of the river. *Smith's* survey does not state the courses and distances, and we are therefore unable to compare it with the others. If there was a mistake in the quantity, the equity of the appellant's case is to have the surplus paid for at the same rate, but not to unravel the whole.

In *reply*, it was said that the 9th section of the act of 1713, 1 *St. Laws* 98, gave an appeal from every definitive sentence of the Orphan's Court; and that as to a ratification by the guardians, or the minor himself after coming of age, the former never intended to ratify the proceedings, and

(*a*) *Plowd.* 297.      (*b*) 5 *Johns.* 66.      (*c*) 3 *Burr.* 1801.

they had no legal authority to do it, so as to bind their ward. They did not suspect either fraud or mistake, and therefore never purposed to cure them. As to the minor, he is not bound by a settlement made immediately upon coming of age, when he is not supposed to be, and in the present case, certainly was not, conusant of the wrong done to him. This has been settled upon many occasions. *Cocking* v. *Pratt* (a), 1 *Fonbl.* 130, and the authorities there cited.

TILGHMAN C. J. after stating the case, delivered his opinion as follows.

The reasons which have been urged on the argument of this cause for annulling the decree of the Orphan's Court are, 1. That *William* had no guardian at the time of the valuation, and the Orphan's Court were ignorant of that circumstance, it not being stated as it ought to have been in his brother *John's* petition. 2. That *John Elliot* fraudulently concealed from the jury the real quantity of land, which was in fact 19 acres and 13 perches more than was mentioned in the patent. 3. That whether *John* was guilty of fraud or not, still, as the jury were mistaken as to quantity, there ought to be a new valuation. It is also urged as an additional reason, that there were valuable fisheries on the island, which ought to have been specified in *John Elliot's* petition, but were omitted. On the other hand the appellee contends, that *William Elliot* was sufficiently represented by his natural guardian (his grandfather) *Alexander Lowry.* That he the appellee was guilty of no fraud as to the quantity of land, and that there is no proof that the real quantity exceeds that mentioned in the patent; and as to the fisheries, he says that the jury were informed of them and took them into consideration in their valuation; he also says that the acts of *William Elliot* and of his guardian *James Ross* esquire, since the valuation, amount to a confirmation of it.

As this plea of confirmation, goes in bar of *William Elliot's* claim, it will be necessary to consider it in the first instance.

Mr. *Ross* who lived at *Pittsburg* had no particular know-

(a) 1 *Ves.* 400.

ledge of the island in *Dauphin* county, nor is there the least reason to suppose that he knew of any objection to the valuation, or did any act with a view to confirm what might otherwise be invalid. He took for granted that the island had been legally assigned to *John Elliot*, and consequently demanded and received from him the interest of the money which was due to his ward *William Elliot*. It appears also, that he consented to an arrangement between *John* and *West Elliot*, by which *West*, who took some land of which their father died seised in *Allegheny* county, was to become pay-master to *William* for his share of the valuation of the island. There is no pretence for an argument founded on this conduct of Mr. *Ross;* he acted with propriety and fidelity, but never had it in contemplation to give up any right of his ward's. And even if he had so intended, the law would not have permitted him. A guardian, has no power to relinquish the title of his ward; his release would be of no validity. Neither do I see any thing in the conduct of *William Elliot* after he came to age, which can strengthen the title of *John*. All that he did was to settle with his guardian Mr. *Ross*. But even if he had settled with his brother *John*, soon after his coming to age, without knowing of wrongs which might have been done to him in the valuation of the island, and had petitioned for redress as soon as those wrongs were made known to him, I cannot think that a settlement under such circumstances would have stood in the way of his redress. The law looks with a jealous eye on settlements made by infants soon after their arrival at age, and before they are fully acquainted with their affairs.

Having disposed of this previous question, I will now consider the reasons offered by *William Elliot* for annulling the proceedings in the Orphan's Court.

In a petition for valuation and partition of an intestate estate, all material circumstances should be mentioned. If there are infants concerned, it should be so stated, in order that the court may appoint guardians to take charge of their interests. But the counsel for the appellant went too far in contending, that the proceedings were *void* for want of a guardian. That is a position too broad for this court to adopt, unless it could be shown that it rests on some positive injunction of law; because it would shake the foundation of

many estates. A petition to the Orphan's Court for a valuation, is not like an adversary suit at common law, where an infant defendant must appear by guardian, or it is error. But the want of a guardian is certainly an important circumstance, which makes it incumbent on the court to look well to the proceedings, and to lend a ready ear to the complaint of the infant who thinks himself aggrieved.

Although *William Elliot* had no guardian appointed by the court, and although I think it proper for the court to appoint guardians in all instances previous to the partition or valuation of an intestate's estate, yet the infant in this case cannot be considered as altogether unprotected. The grandfather, *Alexander Lowry*, was equally near to all the children of *Daniel Elliot*, and it must not be forgotten that he made very active exertions to secure the title of the land now in question, the patent for which was issued to him, in trust for his grand-children. He received notice of the time at which the inquest was to be held, and attended, professedly as the friend of *all* the children. *William* was at that time living with him; and had the Orphan's Court been apprized of his infancy, I should suppose that there could have been no person so proper as the grandfather, to be appointed as guardian. Under these circumstances it appears to me that we should confine our attention to the enquiry, whether *William Elliot* was really injured by the valuation of the island. If he was, he is entitled to redress; but if not, it would be improper to vacate the proceedings, merely because no guardian was appointed previous to the valuation.

As to the fisheries, it would have been better if they had been mentioned in *John Elliot's* petition. But as there is positive proof that the jury took them into consideration, there is no reason to say, that any substantial injury has been sustained. We must not suffer ourselves to be carried away by the present value of the island, but consider its value in the year 1799. The unexampled prosperity of the *United States* since that time, has made a prodigious difference in the price of lands, and these fisheries appear in particular to have risen in value. In considering this matter, I am struck with the circumstance, of no attempt being made by the appellant to prove that the island was undervalued, or that any person would have given more than the estimate

1812.

ELLIOT
v.
ELLIOT.

of the jury. On the contrary it is proved that ten of the jury thought the valuation too high, and were induced to fix it at 10*l.* an acre, only in consequence of one of their bre‑ thren's asserting that he himself would give that price. And had the *United States* been involved in the wars of Europe,, instead of enjoying the blessings of peace and neutrality, perhaps at this moment few of us would be willing to pay 10*l.* an acre for the best island in the *Susquehanna.*

If then there was no wrong in the price by the acre, it only remains to be considered whether there has been any material error with respect to quantity. I do not think that the charge of *fraudulent concealment* has been established against *John Elliot.* Its support rests principally on the proof of his declaration, when he offered it for sale, that there was the quantity of between 240 and 250 acres nett. The pa‑ tent mentions 220 acres 147 perches, which, with the usual allowance of six per cent., would make about 234 acres *nett.* If to this we add nine or ten acres which *John Elliot* might suppose to lie between the bank and the water, and which his counsel contend it was not the custom to include in the measurement of an island, we shall have the quantity of be‑ tween 240 and 250 acres. If there is ground for the asser‑ tion, that this was the usual manner of measuring islands, it will be too harsh to charge *John Elliot* with fraud, because he told the jury that they were to value the quantity of land contained in the patent only. It must be supposed that the jury were not ignorant of the usual mode of measurement, and if so, they must have known that when the quantity of 220 acres 147 perches was talked of, the usual allowance of six per cent., and the land between the bank and the river were thrown in. The appellants say that the real quantity is 240 acres with allowance, &c., and this they prove by Mr. *Smith,* who has surveyed it. On the contrary there is the sur‑ vey of the sworn officer of the commonwealth, *Bartram Gal‑ braith,* previous to the issuing of the patent, and a survey made in the year 1763, when there was a partition of the island, agreeing with *Galbraith's* survey except as to 2 acres 13 perches, which may be accounted for by the washing away of the land by the rapidity of the current. *Galbraith* made his survey going as near to the bank as was practicable, but keeping on the bank. *Smith,* when the bank was difficult,

went down on the beach. The land between the bank and the water is intrinsically of very little value. It is useful for fisheries, but if the fisheries were in this case valued by the jury, the land on the beach could make no difference in that respect. I am inclined to think that the usual mode of measuring islands, has been as the counsel for the appellee suppose. If so, we ought not to presume that the jury were ignorant of it; and in that case the valuation was complete, for when the jury valued the quantity mentioned in the patent, they knew that the beach was thrown in. When I consider all the circumstances of this case, and that *William Elliot* is the only one of the family who complains, I cannot help thinking that the great rise of the value of land, is the real cause of this petition. *William Elliot's* loss of quantity, by his own showing, is not quite four acres, and for this he asks us to annul all former proceedings, and make a new valuation of his father's estate, under circumstances essentially different from what they were, when the possession was delivered to his brother *John*. If he had petitioned for a re-survey of the island, and an allowance at the rate of 10*l.* an acre for any surplus which could be fairly made out, with interest from the time when he ought to have received the principal, he would have had reason on his side. But after the course which he has taken, and the expense to which he has put his brother by this suit, I see no cause for reversing the decree of the Orphan's Court. My opinion therefore is that the sentence should be affirmed.

YEATES J. I have no difficulty whatever in my mind, as to the jurisdiction of this court upon the present appeal. The power is expressly given to us, by the 9th section of the act of assembly of 1713.

In considering the questions before us, I throw out of view, all that has been urged respecting the affirmance of the valuation by *West Elliot* and *James Ross* esquires, the former guardians of the appellants. It was not competent to them in their characters of guardians, to confirm proceedings in the Orphan's Court, if they were invalid, so as to bind their ward when he arrived at full age. At all events, as they were ignorant of the circumstances, which have led

to the present appeal, no acts of confirmation on their part, could produce any legal effect.

Upon the most attentive consideration of the testimony laid before us, I can see no rational grounds, from which I can infer that *John Elliot* has been guilty of an actual fraud in conducting the proceedings in the Orphan's Court.

The next inquiry is, have such mistakes occurred in this case, as on sound principles of law and equity, should invalidate the appraisement of the real estate of *Daniel Elliot* deceased, in the county of *Dauphin?* It cannot admit of a moment's doubt, that all the children of the intestate are entitled to a fair, legal and conscionable proportion of their father's property.

We well know the manner in which islands in the river *Susquehanna* have usually been admeasured. The extreme top of the bank of the river has always been deemed the point beyond which they will not go; for this plain reason, that where the soil has been washed away in a course of time by the floods, the intermediate space between the bank and the margin of the stream, being frequently covered with water, is not susceptible of cultivation. The soil too is generally carried off, and is succeeded by sand and stones deposited as its substitute. I cannot therefore assent to the position taken by the counsel of the appellant, that the admeasurement of the island should have been *usque ad filum aquæ* in common times. The beach may serve as a landing place for a fishery, but *as land* for the purposes of tillage, it cannot be placed on a footing of equality with other parts of the island.

In forming an estimate of that part of the island in controversy, we must transport ourselves back to *December* 1798, when the inquisition was taken. The rise of landed property has been so rapid, particularly in this state, that unless gross palpable injustice has taken place, we cannot permit ourselves to take into consideration the amount it would now produce upon the present dispute.

The profits of fisheries in the *Susquehanna* are uncertain and vary in successive years. But the fact is ascertained, that the fisheries appertaining to this island were taken into the view of the jury, and valued with the land. The jurors came from the neighbourhood, and could not be ignorant of

the number of pools which were made use of. They would
not set a value on sandy shore, equal to the tillable portion
of the island, and the valuation of the beach would necessa-
rily be comprized in their estimate of the fisheries. We
learn from the testimony, that until *George Bower* one of the
jurors offered to give 10*l.* per acre for the island and its
appurtenances, five sixths of them did not exceed 8*l.* per
acre in their valuation.——The survey by *Bartram Galbraith*
on the 12th of *April* 1798, on which the patent was founded,
made the area of that part of the island, which was con-
tracted for by *Daniel Elliot* in his life time, 223 acres 147
perches. *Thomas Smith's* survey in *November* 1807 made it
240 acres, producing a difference of 19 acres 13 perches.
This was procured *ex parte*, at the instance of *James Hamil-*
*ton* the guardian of the appellant, (who had been one of the
jurors on the valuation) but it does not specify the courses
and distances which were run, so as to enable us to compare
them with those run by *Galbraith* nine years and seven
months previously, and ascertain in what particulars they
differ. *Frederick Zimmerman* deposed in 1808, that the
water was then three feet deep, in part of the line run by
*Smith.* But we have an important fact disclosed by the re-
turn to the writ *de partitione facienda*, issued by *Joseph*
*Galloway* against *George Stevenson* and *Mary* his wife.
That part of the island allotted to *Galloway*, who afterwards
contracted with *Daniel Elliot*, was surveyed in 1762, and
found to contain 223 acres. *Stevenson* was present at that
partition, as we discover by the inquisition; and I cannot
bring myself to believe, that *Stevenson*, who was an excellent
practical surveyor, and had been for many years deputy sur-
veyor of the county of *York*, would have consented to an
admeasurement, different from the common and usual mode
between *individuals.* Is it not more natural to conceive, that
an island in the *Susquehanna* near the *Conewago* falls, where
the current is swift, as we have been told, would have de-
creased *two acres thirteen perches* within a period of 36
years, than that it should have increased *seventeen acres* in
the course of nearly 46 years, according to *Smith's* survey.
My mind does not hesitate on the subject.

Take the case in the most favourable view for the appel-
lant, it presents at most on this part of the question a *dubi-*

1812.

ELLIOT
*v.*
ELLIOT.

*ous* equity, which the court will not at this day relieve, according to the doctrine of this court, in *Shortz* v. *Quigley*, 1 *Binn.* 2.5.

It remains to be inquired, whether the want of a guardian duly appointed by the Orphan's Court previous to the valuation, is such an error, as demands of the court a reversal of this decree?

It is certainly true, that an infant must defend a suit by his guardian, and that every court has an inherent power to appoint a guardian *ad litem*. Neither of the intestate acts of 1705 or 1764, directs that a guardian shall be appointed for minors interested in a partition or appraisement of real estate in the Orphan's Court. But the principles of natural justice require, that no one's interests shall be affected without giving him an opportunity of being heard. In pursuance hereof, the usual order of the Orphan's Court has been, that notice should be given to the parties interested, of the time of the partition or valuation, and upon application to the court, guardians are appointed for the minor children. It must here be remarked, that the decree of confirmation of a valuation of lands, is not generally founded on proceedings of an adversary nature. The equal policy of our system of laws, requires a division of the lands of a father dying intestate, or their true value among his children; and an impartial jury upon their oaths and affirmations, and personal view and examination, are the means by which it is effected. I know of no case, wherein it has been decided, that under the intestate acts of 1705 or 1764, a party, or guardian of a minor who was a party, living out of the bailiwick of the sheriff, should receive notice, or the inquisition be set aside upon that ground. If Mr. *Ross* living at *Pittsburg*, had been the guardian when this valuation was made, I do not see, that a mere want of notice to him, without strong proof of injustice, would justify us in annulling these proceedings. In laying down a rule which is to operate in all cases, it may well become us to consider the influence it may have in instances previous to the adoption of the rule, because the retrospective operation of it may shake many titles. I will put an instance to exemplify my observation. I should deem it a very proper general regulation in the several Orphan's Courts, that previous to the valuation of lands held under

ancient surveys, the same should be resurveyed, in order to ascertain the true quantity; but if former appraisements are to be declared invalid merely for having a surplus quantity, it would have a serious operation in many instances.

The sheriff has returned here that the valuation of the premises was made in the presence of the parties interested: The question is, was it so made?

That the minor children of *Daniel Elliot* were represented in truth and in fact, when the valuation was made, there can be no doubt. *Alexander Lowry*, their maternal grandfather, attended for the express purpose of seeing that justice was done. *William Elliot* the appellant was brought up and educated in his family, and actually lived with him in an adjoining county, when the appraisement took place. His affection for these children, and the interest he had in their welfare, are amply demonstrated by paying a very considerable sum of his own money to complete the contract made many years before with Mr. *Galloway*, and patent the land for their use. For all his expenditures and trouble he made no claim or demand. No person whatever could be a more proper guardian for these minors, nor feel more deeply interested for their advancement in life. There is no reason to presume, that he did not contribute every effort in his power to do equal justice to all the children; and I consider the appellant as fully represented by his grandfather and nearest friend.

On the most mature consideration, I see no legal or equitable ground for reversing these proceedings, and am therefore of opinion, that the decree of the Orphan's Court should be affirmed.

BRACKENRIDGE J. gave no opinion, having been formerly guardian of the appellant.

Decree confirmed.